Page number 21-1137 et al. Matson Navigation Company Inc. Petitioner v. United States Department of Transportation and Maritime Administration. Mr. Sampson for the petitioner, Mr. Ross for the respondent, Mr. Burgess for the intervener. Good morning Mr. Council, we're here for you. Good morning, and may I please report, Lucas Townsend for Petitioner Appellant, Matson Navigation Company. You can raise the podium if you like. I'm sorry? You can raise the podium if you like, just click the button to your right. And we can hear you better if the microphones are closer to you. Thank you, Your Honor. Lucas Townsend for Matson Navigation Company, and I have reserved three minutes for you. Since 2015, the Maritime Administration has been awarding a windfall to APL in the form of unlawful subsidies to operate vessels in the Pacific domestic shipping trade. Matson is a domestic carrier whose U.S.-billed vessels must compete with APL-subsidized vessels. Matson has repeatedly challenged MARAD's orders for violating statutory prohibitions designed to prevent this grossly unfair state of play. But jurisdictional issues have outed these challenges. The jurisdictional issues are briefed in the briefs, and with the Court's permission, I would like to address MARAD's issues today. Great. I'd like you to address your issues. Yes. Your position now is that the Hobbs Act does confer exclusive jurisdiction to this Court. Is that your position now? Our position is that the best reading, let me just say at the outset, I think there are reasonable arguments on either side of this issue. The best reading of this Court's 2018 decision, the National Association of Manufacturers, and the text of the statute is that the original jurisdiction lies in the District Court. That's the best way to read all of this. I will acknowledge that the government has a reasonable position on this point. At the end of the day, my client simply wants judicial review. We're not trying to plumb the depths of the jurisdictional statutes here because we've been trying to get that merits review for some time. But we want to offer what we believe is the best reading of the precedents. And so I'm happy to address jurisdiction more at length, but we would be delighted if the Court determines that it has original jurisdiction to the Hobbs Act. That was your position back in 2018. In 2018, exactly. We were in this Court. We were under a petition filed pursuant to the Hobbs Act. We were told otherwise at that time. We have taken that into account. We've pressed our arguments in the District Court, and the District Court has disagreed with us, so here we are again. Can I ask you about a jurisdictional question that is not really brief, which is whether Matson as a party agrees within the meaning of the Hobbs Act? Why would Matson be a party agree? Well, Matson has classic competitor standing. Well, you have standing, but that's different from whether your party agrees under the Hobbs Act. We have very specific standards for that. Usually someone has to be a party to the proceedings below. And in this case, there was no way, really, for Matson to be a party. Matson filed comments and papers with Mayrad, but it was not in any sense a formal party to the proceedings. We have been petitioning to be a party in these proceedings because we believe we have a very strong interest in the outcome of these proceedings, but the agency has not allowed us to intervene as a party. So we have a very informal process in which we were allowed to submit a comment, and it was a comment that was really shooting in the dark because we didn't have the document that we were commenting on, and it changed substantially after the agency. But I wonder if it's even possible in the context of the informal proceedings here for someone to be a party agree within the meaning of the Hobbs Act. Well, I think the alternative— So that's a jurisdictional—I mean, that is part of our jurisdiction. So if Matson is not a party agree, then we lack jurisdiction. Well, certainly some court has jurisdiction here, some court. I mean, there is a strong presumption in favor of judicial review of the Agency Act. So maybe the district court does. Well, that was the position that we presented below, and that is what we think is the best reading of the precedents. But again, if this court would like to exercise provisional jurisdiction here today, we would be fine with that outcome and simply trying to get judicial review. I would like to address merits today, if the court's indulgence. The 2022 approval order for the Dakar rests on a fiction. It rests on a fiction that there was a vessel under an operating agreement in 2022 called the Agate. There was no such vessel. That vessel had been withdrawn from the fleet. It had been decommissioned, and it had been scrapped years earlier, almost six years earlier. In 2022, there was no vessel under an operating agreement. I don't really – I don't just lay my cards on the table. I don't really find that argument super persuasive. I don't know what basis there is in the text for it. If my car breaks down and, you know, I don't get around for another year until buying another car, I'm still replacing my old car. Even if, you know, I sent my old car to the junkyard and it's turned into scrap, I just don't understand how your argument ties with the common sense of the text. Well, I would suggest that Marad has itself taken a very similar position with respect to the Saipan. JA 197, note one, Marad filed a declaration in which they say the Saipan is not a vessel under an operating agreement when it is ejected from the fleet, when it was – when the Saipan was removed from the fleet. Afur Shi'ari, when a vessel is withdrawn from the fleet and it is scrapped, it is no longer a vessel. Afur Shi'ari is not a vessel under an operating agreement. Those two cases are quite different. I mean, the Saipan was no longer a vessel by operational law. Well – Isn't that an important distinction? We think that it's exactly the same position with respect to the Agate. The Agate was not, by operating – under law, under the operating agreement and by reading the statute, it was no longer a vessel under an operating agreement. That is really the same – now, there was a factual component to it that wasn't present in the case of the Saipan. But that's all the more reason – all the more reason why it was not a vessel under an operating – and I – So, Marad seems to take the position that under an operating agreement just means the vessel that's mentioned in the operating agreement. That's the Agate. Why isn't that correct? The operating agreement that they point to is a 2015 operating agreement. Sure, the Agate was in existence in 2015. It was in the fleet. There is no basis for saying – They're deeming that to be the operating agreement. It's not the one that's in the agreement? In 2022. Well, they're – we submit that there was no vessel under an operating agreement. There has been a vessel in the meantime, the Saipan. So, you're not really addressing the argument which is under an agreement is just the one that's in the agreement. Why is that not correct? Well, it has to be – there has to be – it has to be – first of all, there has to be a vessel. And it has to be subject to legal force under an agreement. That contract, 2015, had no legal force on the Agate in 2022. The Agate did not exist any longer. That contract – the agency is just deeming that to be the contract in 2022, ignoring the fact that there was another vessel. I'll just try one more time because each time I ask you this, you go to a different interpretation. I'm just saying what's wrong with Maywright's interpretation? And why is it not reasonable? They're saying under an operating agreement, there's no verb in that. They're just saying it's the vessel that's named in the agreement. What's wrong with that interpretation? But I'll go into your interpretation. What's wrong with their interpretation? It's a fiction. And it allows for fictions. Under that view, it could say the RMS – RMS Titanic. And that would still be the basis for replacement. And there is no way – So, why can't it be? Congress did not want that. Congress spoke in 2018 in response to Maywright's actions in this litigation, prohibited domestic trade for vessels in the fleet that are receiving these subsidies. And that was a very strong statement by Congress. There is no indication that Congress wanted the agency to employ fictions of this sort to bring new vessels. But the statute does contemplate periods when the vessels are not operating. And they don't get kicked out of the program. We're talking about ships. Ships are not constantly operating. And they have to be repaired. They can get sunk if they're called to duty and put into the line of fire. And what you're proposing is a very cumbersome process that is very technical. Like, they have to be continuously operating in order to be replaced. That doesn't seem to grapple with the practical considerations of what a ship is and the fact that they're not constantly operating. Not at all, Your Honor. Because, as Your Honor mentioned, the statute and the regulations provide for gaps in instances where there is a gap. This is not a gap. There is no vessel. They're an operating agreement in 2022. But if they're not even built yet. I'm sorry? Ships that are not even built yet can be an operating agreement. Correct. Because they're specified. And there is provision in the statute that specifies what happens in those circumstances. But here, this must be read in the context of Congress's statement in 2018 that vessels receiving these subsidies can't operate in domestic commerce. That has to frame the inquiry here. And this type of a fiction where vessels are withdrawn, either kicked out or withdrawn from the fleet and there is no vessel in an operating agreement, that would be a new vessel. A new vessel subject to the 2018 prohibition that Congress placed in the statute in response to this litigation. That was Congress speaking in 2018. There are additional reasons why both of these vessels are not properly authorized in addition to the replacement vessel provision. And it's because they are authorized to engage in domestic trade. The statute says that they are either exclusively in foreign trade, they must be exclusively in foreign trade, or in mixed foreign and domestic trade pursuant to a registry endorsement under 46 U.S.C. 12-111. And 12-111 is not the least bit ambiguous. It specifies five territories. But there's a Coast Guard regulation that interprets that endorsement to allow trade within the Mariana Islands. And what's interesting to me, Counselor, is that your client relies upon the same type of endorsement and the same Coast Guard regulations to trade in the Mariana Islands. So why can your client rely on it but APL can't? Well, the agency can rely on the Coast Guard regulation. The Coast Guard regulation is not cited in either of the orders under review. So this is not something that the court even needs to deal with. If this is somehow significant, then the agency can address it in the orders under review in the first instance. Otherwise, it's barred by tenor. But on its face, it fails. The Coast Guard does not administer the Maritime Security Program. They are not interpreting the Maritime Security Act. Whatever vessel the Coast Guard might allow to dock at the port Saipan is not our concern in this case. We're concerned with what vessels are allowed into the Maritime Security Program. But if the endorsement lets them go to the Northern Mariana Islands, why are not they in compliance with the statute? They're operating under an endorsement that lets them go to the Northern Mariana Islands. They first must be eligible to enter into the fleet and receive subsidies. Well, eligibility just says foreign commerce. You're relying on the Statute 105. That's about the operating agreement. Well, the agency itself interprets foreign commerce to mean exclusively foreign commerce or mixed foreign to domestic pursuant to a regulation. I'm familiar with that regulation. But is the regulation allowed to contradict the statute that defines foreign commerce? Well, so first of all, I would say it doesn't contradict the statute because foreign commerce does not modify the statute. And so the agency reasonably interpreted it for purposes of Maritime Security Act to mean exclusively foreign or mixed foreign and domestic. And that goes back. That's interesting, too, because now you're relying on the agency saying they're reasonable. It suits you. They're not reasonable, and it doesn't. Well, I think it cuts the same way. It cuts against the other side's position as well. They want to rely on a Coast Guard regulation that says nothing about the Northern Mariana Islands and plainly contradicts, plainly contradicts. Wait, the Coast Guard regulation, you don't agree that the Coast Guard regulation permits an endorsement to cover the Northern Mariana Islands? Correct. The Coast Guard regulation, well, first of all, the Coast Guard regulation doesn't even mention the Northern Mariana Islands. But it can't contradict 12-1-1. Wait, doesn't your client rely on the same Coast Guard regulation in order to trade for service in the Northern Mariana Islands? I mean, it doesn't say explicitly Northern Mariana Islands. It talks about coast-wise trade. My client is not in the Maritime Security Program. I understand that, but these endorsements are not just for the Maritime Security Program. Well, the Coast Guard is – I mean, the Coast Guard has no authority to interpret the maritime – administer the Maritime Security Act. And that is – the eligibility for entry into this fleet, that is the issue. That is the issue that MARAD has exclusive jurisdiction over. And they have not relied on the Coast Guard regulation, and they have not – The answer to Pam's question about your client's activities vis-à-vis Northern Mariana Islands and other Coast Guards is essentially your client has no Coast Guard endorsement to do that. I – yes or no? I'm not certain whether the answer to that question is for the Northern Mariana Islands. I can address it in the funnel if that's the case. But, again, I hate to point out that my client is not in the Maritime Security Program. It's not subject to the 2018 prohibition. We're a domestic carrier, U.S. vessels, and we are under the Jones Act. So we are not subject to this program and the administration. The Coast Guard regulation simply does not apply in this context. It doesn't apply, and it can't change the plain text of 46 U.S.C. 12-1-1. Isn't there a different Coast Guard regulation, though, that your client needs to rely on in order to trade in the Northern Mariana Islands because there's sort of a gap about whether or how trade happens with the Northern Mariana Islands? A different regulation? I'm not sure. I mean, a different provision of what it's like. My understanding is that in order to trade in the Northern Mariana Islands, everybody, whether you're in this program or not, needs this endorsement under 12-1-1. This 12-1-1 endorsement is not specific to the Maritime Security Program. Your client is a very active, the most dominant, apparently, carrier to the Mariana Islands. Your client is using one of these endorsements under 12-1-0-0-1, which has been interpreted by the Coast Guard to allow trade to the Northern Mariana Islands, regardless of the statutory list, which doesn't include it. And so it was interesting to me that your client would sort of question the applicability of this provision, this regulation, that your client relies upon to do this trade. But we're questioning the entry of vessels into the Maritime Security Program. Oh, I understand that. That is the challenge. But the reason they're allowed to be in the Maritime Security Program as replacement vessels is because they have this endorsement under 12-1-0-0, I'm sorry, 12-1-1-1. And that endorsement has been interpreted by the Coast Guard to allow APL to go to the Mariana Islands. And since your client also does the same thing, it surprises me that you would question the applicability of the Coast Guard regulation to interpret 12-1-0-0-1. Well, the agency, again. Or 12-1-1-1, I'm sorry. Two separate issues. The replacement vessel issue is different from the registry issue. So first, they are not replacement vessels. But it's the replacement vessels that are allowed to trade in the Mariana Islands, because if you're a new vessel, you're not allowed to do that at all. Assuming that they are replacement vessels, which we dispute, yes. Right. It would have to have a registry endorsement. It would also have to be, it would have to have some exceptions to the Coastwide Trade Provision. But, again, this is about the receipt of subsidies for the Maritime Security Program. Correct. But why should 12-1-1-1 apply differently to APL than it does to yours? Because Mariana is administering a different statute. I'm just talking about 12-1-1-1, which is administered by the Coast Guard. Why should it be administered differently to your client versus APL? Well, I think these are issues that the agency could address had it addressed the applicability of the Coast Guard regulation. It did not do that. It did not address the Coast Guard regulation. The order is under review. If this is an issue, the agency— The statute just says that it has to have a registry endorsement under 12-1-1-1. These ships have that. And to the extent you go further, you're the ones who are saying, oh, but what 12-1-1-1 allows or what that registry endorsement allows should not include the Mariana Islands. Then we have to go to the Coast Guard regulation. Well, no. The Congress's judgment was that the statute 12-1-1-1 does not apply to the Northern Mariana Islands. There's no ambiguity. Then you are questioning the Coast Guard regulation. I'm sorry? Then you are questioning the Coast Guard regulation that says you can go to the Mariana Islands. If the Coast Guard regulation applied here, we don't think it applies at all. The agency didn't rely on it. If it applied here, it can't change the meaning of the statute. The statute is unambiguous. It mentions five territories, none of them the Northern Mariana Islands. But that means your client can't go to the Northern Mariana Islands either. They're operating under a registry endorsement of 12-1-1-1, the words of which doesn't include the Northern Mariana Islands. This is why this argument is very interesting to me because it doesn't seem to be in your client's interest to question the registry endorsements under 12-1-1-1, going to the Mariana Islands. Your client needs that to go to the Mariana Islands. I'm not at all sure, and I can address your question if I have a chance to look at it. But I am not at all sure that the 12-1-1-1 registry endorsement is the basis for my client to visit. I think it is, counsel. But in this context, the Maritime Security Program is administered by Marat to allow vessels to receive subsidies in this program. It is a different context in which Congress has spoken very clearly about the limits of domestic trade for vessels that are receiving these subsidies. That frames the issue quite differently from a Jones Act barrier providing trade to the Northern Mariana Islands, quite a different situation. I'm – I see I'm over my time. Why do we need to reach this issue with respect to a vessel that's not going to trade domestically? That's an understanding for a heraldite. I believe it's the Dakar. The Dakar – there's an argument that the Dakar does not currently trade with the Northern Mariana Islands, but it has been authorized to trade with the Northern Mariana Islands. And that's the problem. There would be no further agency action needed for the Dakar to start calling Saipan. And the admission of the vessel into the fleet currently receiving subsidies, that is unlawful if the vessel is authorized to trade with the Northern Mariana Islands. That would be contrary to 12-1-1-1. Independently, it would be contrary to Section 502B of the covenant established in the Northern Mariana Islands. These are activities of a contractor of the United States. Why shouldn't we take the position that if and when that happens, you have a right to challenge them, but it's not right then? Well, there's no agency action that's required before that happens. It's the admission into the – the agency action has occurred. It's the admission into the fleet and the receipt of the subsidies with the authority to provide trade to the Northern Mariana Islands. That is the action here for challenge. No further agency action has to happen. And APL takes the position they don't need any further agency approval if they begin serving – begin calling the Saipan port. So it is right now. The issue is right now. And the agency has simply authorized something they have no right to authorize. The statute prohibits it. Again, I come back to Congress's – yes, ma'am. Why did Matson agree that the challenge to the Guam was moot? Because if Matson believes that the Heredote was unlawful because the Guam was unlawfully approved, then why not maintain that the suit against the Guam approval was still live? I think – well – I mean, because that seems to be the core of the dispute. I think ultimately the Heredote is unlawfully in the fleet for the same reason that the Guam was. And I think that, you know, the prior challenge, the replacement vessel challenge, is something the court doesn't need to decide in order to find that the Heredote is unlawfully in the fleet. But in 20 – I think it was 2018 or – But, I mean, is the challenge to the Heredote separate really from the underlying challenge to whether the Guam was lawfully? It is in one respect. In what is the legal way in which it is distinct? Well, there are two arguments. One is that it is not a replacement vessel of the Guam because the Guam was not lawfully in the fleet. That is – your question goes to that issue. The separate question is that even if it were a replacement vessel, it is not – it has been authorized to trade unlawfully in domestic trade within Northern Mariana Islands. And that is the Registry Endorsement Issue 12-111 and the Covenant 12-502B, the Covenant Establishment in Northern Mariana Islands. Separate issue. So, Mr. Santana, I know you didn't seem to really want to talk about jurisdiction, but if we were to conclude that there were no jurisdiction here, then there's no grounds on which we would reach any of the merits, is there? If this court does not have original jurisdiction, then it would simply address our appeals from the district court's rulings that it had no original jurisdiction. And so we would presumably then go back down to the district court. We would love to avoid that trip. We've been fighting these orders for a long time. I understand. But there's no – there's nothing left of the merits for us to – That would not be correct. It would not be observant of the merits in this instance. If there are no more questions, I'll serve the hearing. All right. We'll give you some time on rebuttal. I believe we hear from Mr. Ross. Thank you, Your Honor. May it please the court. Jason Ross for the United States. The district court correctly determined that the district has exclusive jurisdiction to review the merit orders challenged here because those orders explicitly relied on Section 50501, which is one of the statutes listed in the Hobbs Act to channel exclusive jurisdiction to this court. Can I just ask you why is Mattson a party aggrieved here, which is another jurisdictional requirement for us to have original jurisdiction in the Hobbs Act case? So the government doesn't dispute that Mattson has an Article III injury. And I think – That's not – party aggrieved is not only about Article III injury. The aggrieved part is that you also have to be a party. I agree, Your Honor. I think actually the real answer is maybe a practical one, which is if, say, merit had denied one of APL's applications in this case, I think we would all agree that APL would be a party aggrieved under 2344. And it would be quite odd if Mattson would have to follow a different rule under this court's jurisdictional holding rather than APL itself because I think that if APL were to challenge an agency decision, it would come to this court. But if a third party has an Article III injury based on the agency's decision is challenging the same underlying order, it would be quite odd that that order would have to be challenged in the district court. Maybe. I mean, you know, in a case like this where the proceedings are so informal and Mattson files a series of comments, many of which are not really responded to by merit, maybe it is appropriate when someone is not a party to the agency proceedings that they have to go to district court first. I think I have a legal response as well as a factual one with respect to the problem you posed. The legal answer, I think, is that this court has repeatedly reiterated that consistent jurisdictional rules should apply to different kinds of parties. In the Media Access Project case, for example, it's made clear that when there is a jurisdictional hook to a particular agency challenge, then the whole suit is looped up into the Court of Appeals to exclusively review the case. The second is that Merid did actually substantively engage with all of Mattson's challenges. So what if Merid, so here Mattson asked, you know, can we, you know, can we file? Merid said, sure, you know, we're happy to take your comments. And so they did. What if Merid had said no? You know, this is an informal proceeding. We don't hear from third parties. There's no way to file comments in this type of proceeding. Then would Mattson be a party agrees? I think so. And I will say for the court certification, that is what happened in the 2018 challenge. So basically Merid. But they didn't think that, you know, the court didn't address party agrees in that case. Right. But so would Hobbs Act jurisdiction, I mean, it's hard to see if they file no comments and have no participation below. Under our case law, it's hard to imagine how they could be a party agrees. I think I will just return to my answer before that it would be quite odd that to be aggrieved means one thing for participants in the program and another for. Then that reads out party, right? Because if say Merid, if Mattson didn't participate below, they would really in no sense be a party. And that would read party out of the Hobbs Act. And we have a long line of case law saying party is important. It's not just a person agrees, you know, as an APA. You have to be a party. In some sense. I guess. So that would read party narrowly to suggest only parties before the agency itself. I think that's what our case law says. That you have to have participated in some way. But that's also true in this case, right? That Mattson filed extensive exhibits with the agency. I think they're concerned about what the rule would be in a situation where agency proceedings are informal. And the ability of someone to participate as a party is sort of at the grace of the agency. So if Mattson's not allowed to file comments, then they're not a party aggrieved. And if they're allowed to file comments, just sort of based on whatever Merid decides in that particular informal case, then they become a party aggrieved. And it seems strange that our Hobbs Act jurisdiction would turn on such a distinction. There are almost no cases addressing a circumstance like this where the underlying agency proceedings are informal. You're right, Ronna. But I think that's why party aggrieved here should be read to include Mattson who did participate for the agency. Oh, why? Because they are aggrieved by the agency's decision. As I said. Well, they're aggrieved. My question's not about whether they're aggrieved. I think competitor standing here is reasonable. But are they a party? So maybe they can challenge this in district court, right? But they don't get to be party aggrieved under the Hobbs Act. I don't know what to say further, Your Honor, except that it seems natural to apply the same rule to participants in the program and to people who challenge. It's not what our case law says, though, right? I mean, we have a series of cases, including a number of recent cases. And that's not the standard for what a party aggrieved is under cases like, you know, Ohio Nuclear Regulatory, which is a recent case, another 2018 case. I mean. I apologize, Your Honor. I'm just not familiar with those decisions. As you acknowledged previously, this question is not brief. I will just reiterate, though, that for purposes of review of agency decision-making, the process is very similar in district court as it would be before this court. That is, the administrative record is presented to the court for the court's review. There aren't questions of credibility or witness determinations and the like. So to the extent that there is some concern with procedural irregularities and that sort of thing, that is something this court is perfectly suited to do. And I will just again say that before, if you'd like me to turn to the merits, I'm happy to engage further on the jurisdictional question. But as my colleague mentioned, I think all of the parties here are eager to address the substantive dispute before the court. That said, it would make sense to apply the same definitional rule of a party aggrieved to all participants before an agency, even in an informal adjudication. And that the same rule would apply to someone who is petitioning the agency for a particular decision, as well as a third party who is contesting or possibly supporting that agency decision-making. So I apologize I don't have anything further because this question wasn't brief. But with that, I can turn to first the replacement question under 53-105-F. I think the most natural textual understanding of that particular provision is that there was a vessel subject to legal obligations at the time that the Dakar replaced the Agda. And it might be useful if the court is interested to zoom out a little bit and understand why we are in the current dilemma that we're in. And that's because in June 2020, the district court vacated the Saipan decision. And roughly a month later, Mara re-approved the Saipan to participate in the program. Matson again filed suit. And subsequently, APL applied to replace the Saipan with the Dakar. And that was in June 2021. So at that time, the Saipan was participating in the program. And APL had applied to replace the Saipan with the Dakar. Two months later, Mara determined that, in fact, the Saipan was not eligible to participate in the program. It had become too old, essentially. There are reasons I can get into that, but it's probably not worth that much more confusion. Then two months later, in October 2021, Mara determined that the Saipan couldn't participate in the program and snapped back APL's then-pending application for the Dakar to the Agda. At that time, APL was subject to legal obligations under the relevant operating agreement. And Mara had simply determined that the vessel subject to those obligations was the Agda. Now, the agency additionally waived APL's ostensible noncompliance with the operating agreement's terms because the APL itself did not fail to comply with those requirements on its own. It was because of this protracted litigation, in fact, that there was some dispute caused over which vessel was actually participating and applying its trade in the Pacific Ocean. So the agency reasonably determined that it would waive the what I'll call the heel-to-toe provision in the operating agreement so that APL could replace the Agda with the Dakar. If there are no other questions on the replacement vessel, I can also turn to the question of the Northern Mariana Islands. We'll just point the court to... So your argument is really more of a factual one as opposed to statutory interpretation? There is a statutory interpretation argument as well, Your Honor, and that is because I believe for the reasons Judge Pan identified, the upshot of Matson's case is that a vessel must constantly be in operation while participating in the maritime security program. And that kind of belies common sense. And Congress recognized as much. 53-106-D3 provides for gaps in service. 53-104-C1 provides for breach of an operating agreement. And indeed, 53-102-B2 specifically provides that a vessel that is yet to be constructed can be admitted to the program. All of this goes to say that there are circumstances in which a vessel is not actively applying its trade that the agency could determine that it could participate in the program. Is there any limitation to that? I mean, your front on the other side says, what about the Titanic? You know, if the Titanic was under an operating agreement. I mean, is there any type of temporal or other limitation? So 53-104-C3 provides that the agency shall terminate an agreement in which an operator is not complying with the terms. And in those circumstances, a vessel operator has an opportunity to cure the breach. But the agency is directed, Congress directed the agency to terminate agreements that are not being, whose terms are not being satisfied. And the agency here reasonably determined that APL was endeavoring to comply with the operational requirements. And as I mentioned previously, essentially was at all relevant times here. At least the times when. So that's within the discretion of the agency to decide. I think that's part of it. Yes, Your Honor. The textual argument as well, if you look at the phrase vessel under an operating agreement, denotes legal obligations that attach to the vessel itself. It's not a question of what is a vessel because that sort of singular focus on the vessel itself is instead a question answered by 53-102, which is a vessel eligibility to participate in the program. I apologize. It's a little bit of word salad with all of the statutory provisions. But that's why the relevant phrase is vessel under an operating agreement rather than simply what is a vessel. And that question is one that is what is a vessel is one that the agency answered very long ago with respect to the AGATA's entry into the program. Can I just ask you another jurisdictional question? The one that is briefed, but what is the reasoning for us to have jurisdiction under 50501? I mean, if you look at the Matson 1 case, the 2018 Matson case and the NAM case, it seems hard to see how this is, you know, pursuant to a definitional phrase, which is 50501. I think this court in Matson 1 suggested that there's a distinction between implicitly relying on a statutory provision and explicitly relying on that, such a provision. I realize that's sometimes difficult to discern, but as a factual matter of spirit, that's not a hard question. There are a number of pages, it's JA 157 and JA 479 to 480, in which the agency carefully analyzes whether the vessels are, would satisfy the requirements of 50501. And that's an important predicate for participation in the Maritime Security Program. Part of the point of the program is to have vessels participate in times of war or national emergency. And so there's actually a really important consideration that the vessels be U.S. citizens, as Congress has defined them. The Hobbs Act is very specific in terms of listing under which provisions you get in an original court of appeals jurisdiction, similar to in the Clean Water Act case in NAM. In NAM, yes. Right. And so one of the provisions that's not listed in the Hobbs Act is the replacement vessel provision. I mean, if Congress had wanted there to be exclusive direct appeal, you know, to the courts of appeal, then it could have easily listed that. But it didn't list that provision. It lists many other provisions in the same space. So does this mean that any determination by the Department of Transportation that implicates the definition of a U.S. citizen under 50501 gives us exclusive jurisdiction? Yes, I think so, Your Honor. Isn't that a very expansive reading, then, of the exclusive jurisdiction provision in a way that is really in tension with the NAM case? I don't think so. And, in fact, it's worth looking to the first sentence of 2342-4A, which says – which affords this court exclusive jurisdiction to review final rules, regulations – or, excuse me, rules, regulations, and final orders. I mean, it's that final order language that's particularly important and which the district court phoned in on here, which is that 50501 doesn't actually give the agency authority to issue any orders. And everyone agrees here that the decisions were issued under the authority of 53105. So it's quite possible that rules, regulations, or orders – not all of those things apply to all of the provisions under which we might have original jurisdiction, right? So I don't know what an order means pursuant to a definition, right? Like, how does a definitional – how is an order pursuant to a definitional thing? It might only be for rules and regulations. And there may similarly be other provisions that are listed, and I haven't, like, studied all the provisions in the Hobbs Act. But some of those provisions may not be susceptible to rules or regulations but only orders, right? So all three words don't have to apply to every single provision. So two responses, Your Honor. First, as a textual matter, the Hobbs Act, in listing out many provisions, some of the subsections only say final orders. Others only say rules and regulations. So I think the fact that Congress included final orders when referring to the maritime security provisions, that actually is quite significant. And so then I think the real question is how do we construe pursuant to – Well, it's rules, regulations, or orders. Right, right. So it doesn't have to be – again, I don't know. I mean, I don't read all of those things have to apply to all of the provisions that are listed as the grounds for exclusive jurisdiction. If not, then the court would not be giving full effect to each of those terms. And so I think that everyone – or that each of the terms should be read to apply to each of the different statutory provisions listed in each of the Hobbs Act subsections. I'm guessing that some of those provisions aren't really susceptible to rules or regulations in the same way that the definitional provision is not susceptible to an order. I guess I don't know, as a matter of fact. I will say that the 50501 determination is one that undergirds a lot of maritime security program orders. And so wouldn't that be a very expansive reading then of our original jurisdiction? I don't think so, Your Honor. And to the extent the court is concerned, I think we can all agree there aren't a whole lot of cases involving the maritime security program. And so it's not as if there's Pandora's boxes being opened here. Certainly to the contrary, this is a relatively niche area that would not stand the court's jurisdiction, but rather simply give effect to Congress's terms. And I guess I will just point out that this court has also reiterated that in a jurisdictional channeling statute, to the extent that there is ambiguity – you know, in AFL-CIO v. NLRB, it suggested that that ambiguity is construed in favor of conferring this court with jurisdiction. Those cases arise where there's a statute that has a very broad original jurisdiction grant. It's not a statute like the Hobbs Act where there are specific provisions granting original jurisdiction, like in the Clean Water Act. So I don't think those general cases saying that we interpret the ambiguity to favor, you know, appellate jurisdiction, original appellate jurisdiction, applies in a context like the Hobbs Act. Does the Third Circuit in Canoco v. Skinner hold that Pursuant to under the Hobbs Act means acting or done in consequence or in prosecution of anything, hence agreeable, confirmable, following, or according? Yes, it will. That's right, Your Honor. I will say, and I think the government does not rely on Canoco v. Skinner because that case involved a challenge to a regulation. And in fact, it was a regulation at issue here. And I'm not sure that much of the reasoning of Canoco survives the NAM case because Canoco relies very heavily on policy arguments and, you know, functional arguments about the way this works, which I think are very much undercut by the Supreme Court's decision in NAM. That may be the case. I will also point to the government's brief in the 2018, or excuse me, in the 2020 Matson case, which I believe Judge Wilkins was on the panel for that case, which was dismissed as moot. There we cite a number of decisions from the Second and Seventh Circuits, which explain and give a little bit more meat on the bones to what he's pursuant to, usually articulating what is the necessary predicate for the agency's decision or what is a key legal premise upon which the agency has to rely in order to issue the decision. And those cases only support our theory here that invoking Section 50501 or making a determination that a vessel meets the citizenship requirements is in line with the statutory provision itself and wouldn't give those court jurisdictions. So just sort of considering the very importance of having clear jurisdiction rules, right, whatever the rule is, so we don't have this type of litigation where people have to go to both courts if they're not sure. What should be the rule in a case like this? I mean, does the agency, is mentioning 50501 sufficient? So if they mention that, does that give us Hobbs Act jurisdiction? Does it have to be something more than that, you know, where they're really relying on 50501? I mean, what's the, what's the law? I think clarifying this court's ruling in Matson 1 is certainly sufficient. That is, the agency's reliance on or that the statutory provision is a predicate for the agency's decision, then it would fall within the jurisdictional channeling provision. There could be some sort of exception for, you know, to prevent agency gamesmanship such that, you know, citing a provision that is certainly not at issue would not give the court jurisdiction. You know, I understand that concern, and the government is sensitive to accusations that agencies will play games with, you know, choosing the court of appeals versus the district court. But, of course, there's a question whether the agencies actually have any interest in doing that. But the point being that there could be an out, as it were, or. How is someone supposed, how is a party supposed to know whether citizenship determination was a predicate, if that's your line? So that's for eligibility decisions under 53-102. That's usually a question. 53-102C specifically requires that vessels need to. Since that's required, there had to be. And so then you wouldn't have to necessarily mention 50501. Yeah, that's why I don't think that mentioning it is a good test or even really very relevant. I mean, it's relevant to the extent that if it's mentioned and that some evidence is denied, who cares if it's mentioned, whether or not it's mentioned, if it's clear that finding under that statutory provision. I agree, Your Honor. I suppose that in an effort to ensure that there are clear jurisdictional rules and the agencies are on notice, that element of legal formalism might be helpful in this regard. Because if agencies are required to specifically invoke particular statutory provisions in order to have a jurisdictional channeling statute apply, then that's something that at least they also understand. So I think relied upon is the better test, but maps in one seem to suggest that it has to be explicitly relied upon. It also has to be mentioned. Right. And so the explicit reliance or the citation, as well as I think. Actual reliance. Yeah, I think the court also used the language rest its analysis on. I mean, so that also from a substantive as well as formal perspective, I think, would be the belt and suspenders approach. I do want to just briefly address the Northern Mariana Islands just so that the court or the court's pleasure at the court's pleasure. So I will just note that quick note to Madison's reply brief on page 23, they expressly disavow challenging the Coast Guard regulation. I'll also point the court to 46 USC, 2103, 2104, which afford the Coast Guard authority regulatory authority to oversee regular, excuse me, to oversee registry endorsements. So, just for the court's awareness, merit does not enforce 1211. It merely ensures that vessels comply with that statutory provision. The Coast Guard and customs enforce that provision. That's why the government suggested, citing the Collins case, that in these kinds of circumstances in which agencies have overlapping regulatory ambit, and there are statutory provisions of cutting implications. That you defer to the agency's expertise laden, excuse me, expertise laden decision making to understand how all of these statutes fit together. The one key piece that I think Madison avoided mentioning in the opening part of the argument is 46 USC 55101, which generally exempts from the Coast Wise laws, the Northern Mariana Islands. It's that gap between 55101 and 1211 that the Coast Guard regulation attempts to fill. So, the Northern Mariana Islands, as an American territorial possession, trade with those islands. That is, these domestic trade. But 55101 also generally exempts those islands from the Coast Wise laws. So, the Coast Guard naturally tried to fill that gap by saying that trade with any domestic point in which a Coast Wise endorsement is not required would be permitted by a registry endorsement under 12111. So, I have a question about your regulation 46 CFR 296.2, which defines foreign commerce to include more than what the statute defines commerce to include. So, 296.2 includes it. Mixed foreign and domestic trade allowed under registry endorsement. It pulls that language into this definition. And then this definition is used under a regulation about eligibility.  63102, right? I think it's 296.11. A vessel is eligible if it's operated in foreign commerce. So, the problem is the statute defines foreign commerce differently. It doesn't include that mixed trade business. And so, I'm just wondering if your regulation is contrary to the statute and therefore invalid. To the extent the regulation is inconsistent with the statute, the statute certainly governs, Your Honor. I don't think Maxim's challenged the substance of the regulation itself either. But I don't think – I also don't think that their challenge turns on the validity of that regulation. Because even under – No, they are relying on that regulation to make what under the statute is an operating agreement issue into an eligibility issue. Right. I agree. So, they're trying to rely on it. But it seems like this regulation, to the extent that it conflicts with the statutory definition of foreign commerce, cannot possibly be that. I think that's right, Your Honor. So, this would go to the government's argument that 53102 requires the vessels be subject to an operating agreement. And that operating agreement would provide that the vessels participate in foreign commerce. And then there's a separate question, I think under 53105, whether vessels in complying with their operating agreements terms can participate in foreign commerce or mixed foreign commerce and domestic trade. So, I think the government's primary argument with respect to this Northern Mariana Islands point is that at the time the vessels applied for the program, they satisfied the terms of 53102. Because each of those vessels operating agreements specifically provided they participate in foreign trade. You know, the agency might – Right. So, you would want to disregard these two regulations that report to also talk about eligibility. Like, you're just relying on the statute about eligibility. But you have two regulations that speak to eligibility that support NAFTA. I think then the question goes to whether 53105 is a relevant consideration under – for making the initial eligibility decision. And so then – That's a different argument from these regulations, though. They're relying on these regulations to say this is eligibility. Because 105 talks about what you have to have in an operating agreement. Right, right. I get that. But they're saying you have these two regulations that import the 105 language into eligibility. Right. So, there's not a clean break between eligibility and, you know, the operating agreement itself. I agree with that, Your Honor. And so, to the extent that you disagree with the government's 53102 argument, I think then it becomes a question of do the vessels – or is the vessels trade in the Northern Mariana Islands consistent with 53105? Right. Okay. Thank you. Absent additional questions, we urge the Court to affirm the District Court's decisions in 2252.12 and 2252.24 and to deny the petitions for review in Cases 21-1137 and 22-1150. Thank you. Thank you. All right. We will hear from Council Court Intervener, Mr. Burgess. Thank you, Your Honor. Brian Burgess for the APL Interveners. Given my limited time, I would like to jump to the merits, if that's okay, but to just maybe follow up on one factual point raised by Judge Rao's questions. With respect to the hairdo, ATSOM did not participate and agree in that proceeding. So, government counsel argues its participation as a party is necessarily limited. So, to the extent Your Honor thinks that they are not a party, I agree that all the lines are matched. And we have taken the position that we're actually the only party that has taken a consistent position on jurisdiction throughout these proceedings that the actions should lie with the District Court rather than the Court of Appeals. But not on the grounds of party agreed. I'm sorry? Not on the grounds of party agreed. Right. Do you believe that Matt... No, we don't disagree. The position is addressed by your question. So, turning to the merits and to Matson's lead argument, which takes the remarkable position that an operator loses the ability to replace a vessel when it becomes inoperable, such as through a casualty or an accident. In other words, that you lose the ability to replace a vessel when it's most obviously necessary. As Judge Wilkins and Judge Pan's questions I think alluded to, there's no basis in the statute for that restriction. The statute does not... It refers to a vessel under an agreement, which we and the government understand to be a vessel that was identified under the agreement and is bound by its obligations. There's no implicit requirement that it be currently operating or otherwise seaworthy. And it's contrary to the structure of the statute to impose such a requirement. We want to address Matson's argument suggesting that... Again, I don't know how they justify drawing a line between a casualty or an accident and the facts of this case, but they seem to suggest, well, this is different because the vessel has been inoperable for six years. But that's just a consequence, as the governing counsel indicated, of the way the litigation unfolded. And function of a vacature of our approval is that it restores the status quo ante. That's well-established in the case law. It's a position Matson itself has taken at other spots in this litigation. That reverts things back to 2016 when you had the original replacement, the vessel under that agreement at that time. And to Judge Rao's question before, is there any limiting principle to this? Could there be a gap forever? I agree with the position of the government that as long as there is an operating agreement in place and a vessel identified by it, you have a right to replace that vessel. But there are restrictions on your ability to proceed under an operating agreement if you're not going to be operating. Mr. Wirtz, what about Mr. Townsend's argument that allowing this type of replacement is inconsistent with the 2018 statute that Congress enacted? I mean, Mr. Townsend takes sort of a broader purposivist type of view of that statute, and it's sort of designed to limit what Matson views as a kind of rent-seeking. Sure. I mean, a few responses to that. One, counsel indicated that that was passed in response to this litigation. I have no idea what his basis for that is. There's nothing in the legislative history that suggests that. In any event, in 2018 precedes this controversy about replacement. There was a controversy at the time about what the proper scope of service would be authorized. So I don't see how that statute can be read to address this issue, particularly because it did not in any way amend or affect the operative provision about replacement. It placed service restrictions on new entrants to the program. It did not in any way change when you can get a replacement vessel. So I think it would be an odd reading of that provision to modify the preexisting 53-105-F provision that is what actually governs here and determines when you could have a replacement. The reason they're making this argument, of course, is because they care about trying to get the service restrictions under the 2018 NDA, but the argument wouldn't be limited to that. It would apply across the MSP and really have a disabling effect of participants' ability to replace vessels under the program. If there are any other questions about replacement, I'm happy to address it. Otherwise, I'll turn to the question of service to the Northern Mariana Islands. And a few points on that. One, I do think it's very important to judge Ken's questions picked up on this, but there's only one registry endorsement. There's not a registry endorsement that applies to MSP vessels and other vessels, which is what Maxim is trying to argue. They're trying to have it halfway that the registry endorsement would allow less service with respect to the MSP vessels. There's just no basis in the statute for that type of understanding. The statute 53-105A refers to domestic trade allowed under a registry issued under the statute. So there's no basis to provide a different rule for MSP vessels and other vessels. If they actually wanted to attack it, they would have to attack the Coast Guard regulation. But they have consistently declined to do that throughout this litigation. I think Judge Pan's questions allude to why. It's understood that that is how this operates and that is how people, including Maxim, in this industry do operate. As to Maxim's argument that the court can't even consider this, that the agency didn't address it, that's just not correct. If you look at pages 280 through 283 of the joint appendix, the agency, and this is the opinion from the chief counsel, addressed this exact issue about the scope of service allowed under a registry endorsement. I understand Maxim's argument to be, well, that doesn't count because it was from a different approval order, but it's involving the same question about approval of a replacement under the agit. It's the same controversy, same parties. It was remanded by Judge Moss specifically to address this open question, and it was done so in a thorough or authoritative opinion by the chief counsel. So the notion that Chenery prevents the court from upholding the agency on that rationale, I don't think is supported in a very strange rule to require the agency to repeat its analysis of factors that it thinks are not relevant in every approval order. Another, I think, important point to mention from that same chief counsel memorandum is it addresses the questions we're asking Judge Pan about the regulation, which goes to the question of, you know, is it eligibility or is it operational service? The chief counsel, this is at 279 through 280 of the memorandum, addressed the regulation and essentially said that, you know, in this context where it's going beyond what the statutory definition is, we apply the statutory definition. There's no indication that the agency intended to restrict or expand what the requirements are for eligibility under the NSP. And if you look at the regulations as a whole, for example, the definition of an eligible vessel under 296.2 refers specifically to 53102 rather than 53105A. So there is some confusion with the regulations. The agency acknowledged that. Judge Moss, I think, called the regulations confounding because when you apply that statutory – I'm sorry, the regulatory definition for foreign commerce, you try to plug it in across the regulation, it just doesn't work. You try to do it, it just results in redundancy and gibberish. So the agency, you know, I think in a genuinely ambiguous regulation would be held to our deference that that isn't controlling. But in any event, as the government counsel indicated, even if the court were inclined to think that 53105A were somehow relevant to an eligibility determination, the service that is engaged in is probably lawful. To Judge Wilkins' question about the Dakar, although, again, we think service to Saipan is perfectly lawful under a registry endorsement, we see no basis to possibly reach that issue here with respect to the Dakar. The agency was clear in its decision that it understood that Dakar was not going to be calling that court. And the argument that – But nothing in the approval prevented – No, that's true, but that's just because the approval isn't directed for it. I mean, the MSP statute is not structured to provide pre-approval to every court you might call. It's just determining whether this vessel is an eligible – But the agency action is the same. Nothing will change if APL calls on Saipan with respect to the underlying agency action. That's right. And I think it just goes to show that the question of operating conditions are separate from the determination of whether a vessel is eligible. But to the question of whether there could be an additional action to challenge, I mean, the relevant action, I would think, would be the payments under the MSP program. To the extent we're engaged in service that MADSEN believes or that the agency were to determine is contrary to an operating agreement, that would be the relevant opportunity. How would that work? So let's suppose, you know, hypothetically, for the sake of argument, that there's a challenge based on your client not operating consistent with the operating agreement. And you're saying that there would be some vehicle for MADSEN of some third party to challenge the payments? I mean, certainly we'll have defenses, and I'm not going to give any of those away, but I do think that would be the relevant agency action to challenge the payment as being inconsistent with the statute. What would that mechanism be? I think it would be an APA challenge, just as they're trying to challenge it here. Sending payments is in itself arbitrary. Again, we think the service is perfectly lawful, so imagine we might have other defenses that would be raised to such an action. I think that is the problem. But I think that would be the proper vehicle to challenge it, you know, if you're concerned with operating rather than approval. Do you think this court is precluded from reaching the question for Dakar because of the agency's understanding that it won't go to Saipan, or that just is a prudential matter? Well, I think it's not presented in light. I think it's not precluded in this outlining about whether it thinks the service is proper or not, but I don't think – it can't be something that was necessary to the agency's decision as being challenged. The agency said, you know, you're satisfying the conditions for eligibility under the MSP because you engage in foreign commerce. The suggestion that it implicitly authorized additional trade, whatever the court thinks of that, doesn't determine whether the approval was proper, so it just seems kind of extraneous, I think, for the challenge that's been presented. The court has no further questions. If the court reaches a merit, we urge you to uphold the decision. All right. Thank you, Mr. Townsend. I think that you were out of time, but we'll give you three minutes. Thank you, Your Honor. Three points. First, to reiterate, this is not a case about a gap. There are provisions in the statute that deal with gaps, marine casualties, time spent in dry dock. That's not this case. If that had happened, the agency would have addressed those provisions. That would be the basis for the reasoning here. This is a case about a no vessel, no vessel under an operating agreement. That's quite different on the situation of a gap. Second, the division between eligibility requirements for the fleet and operation is really quite illusory. To be sure, our eligibility provisions, see 53102B, but then 53103 says that a condition for inclusion in the fleet is to have an operating agreement, and then 53105 specifies what that operating agreement must say. And the agency itself considers trade links. It considers commercial viability when it makes the eligibility determination. You can see that at JA139 and JA452 where the agency actually considers where these vessels will go as part of the eligibility determination. So the allusion, the argument that anything that has to do with contract compliance is something that can just be addressed later, it isn't correct. It isn't found in the statute. The agency itself recognizes that through its regulations, which 296.11 and 296.2 bring these considerations into the eligibility stage. A third point with respect to the Coast Guard regulation, again, it was not addressed. To whatever extent the arguments present interesting issues, the agency did not address them below. The pages that counsel cites are from the Saipan memo, the memo for the reapproval of the Saipan. The agency later withdrew or vacated the reapproval of the Saipan. We don't know what the agency's position is with respect to 296.1, with respect to 63.17, the Coast Guard regulation. For years, the agency took no position, pointedly took no position, expressly said we have no position on the Coast Guard regulation. And when they did address it in the reapproval order, the order was vacated. And then the orders under review here, the Heredote 2021 Heredote order and the 2022 Saipan order, don't address it at all. It is not something that the agency addressed in this case, in these orders, and it would be barred by channeling. Can you address whether your client as a party agrees with respect to the Heredote? You didn't participate in the proceedings before the agency with respect to the Heredote. Well, we don't think that the participation that we were allowed with respect to the Dakar is really any meaningfully different. It was not a complete participation. We were not allowed in as a party status. So we don't see that as a basis for distinguishing between the two orders. But we are a party agree. I'm sorry, did you attempt to participate with the Heredote and you were denied? Yes, we consistently asked to intervene as a party in these proceedings. In all of the proceedings, the agency has always said no, no intervention. But they did consider your comments with respect to the Dakar. With respect to the Dakar, we were allowed to file a comment on an application that we were not allowed to see, an application to replace the Saipan with the Dakar. And then later, after the comments were submitted, the agency treated the application as actually an application to replace the Agate with the Dakar. So it wasn't even the application that we were commenting on, which, again, we were not allowed to see. But did you submit something on the Heredote that they rejected it? Or how did you try to participate with the Heredote? We requested permission to intervene as a party with respect to the Heredote. And they said no. And they said no. But you requested permission to intervene on the Dakar. They said no, but they accepted your comments. Yes, the courts strongly suggested that the agency allow us some ability to speak in the agency proceeding. And so the agency, as a matter of administrative grace, allowed the parties a limited period to comment on the application for the Dakar. And that was in 2016. But I would say – But how can our Hobbs Act jurisdiction turn a distinction? I mean, because under the Heredote, how can you be seen as a party to the proceedings where there were no comments even filed? I would say that the distinction doesn't actually work as between the two orders. But I would say that we're a party – And I think if that's right, then you go to district court. I think we're a party aggrieved to the same extent we would be a party aggrieved under the APA, person aggrieved under the APA. I mean, have you read our party aggrieved cases? I mean, you know, they very much emphasize that party aggrieved is different from person aggrieved. You have to be a party to the proceedings. And we have a Simmons case from 1982 that then-Judge Scalia wrote, all the way up to a case that was just decided this past fall, Ohio Nuclear Regulatory Commission, something like that. I mean, so this is a very consistent line of cases. For 40 years, we say you have to be a party to the proceedings. I can just say that we're trying to make the best of what came before this, including the 2018 decision. This was not an issue in that case, and it was generally accepted. The fact that a court doesn't address a threshold jurisdictional issue doesn't make any binding jurisdictional holding on future cases. Point taken, Your Honor. And again, this is just our best reading of- I think actually the circumstance here makes it pretty obvious why the better rule is an informal agency proceedings. You can't be a party aggrieved. It is our position that the district court had original jurisdiction. We are just simply trying to get review because these orders have been obscured from review for quite some time and trying. And I simply-I just want to leave with the 20-again, the 2018 NDA spoke very clearly about what's permitted here and what is not permitted. Domestic trade for subsidized vessels is not permitted, and that is the rule that goes back to the 19th century. The 2015 order was a sea change in this area, allowing these types of subsidies for vessels and domestic trade. And so if the court exercises original jurisdiction, we would ask the court to set aside the orders under review. Thank you. Case under review.
judges: Wilkins, Rao, Pan